UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HOME ON THE RANGE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:99-ml-9313-DFH-TAB |
| | ) | MDL Docket No. 1313 |
| | ) | |
| AT&T CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ON FEDERAL LAND-GRANT ISSUES

As part of Multi-District Litigation No. 1313, *AT&T Fiber Optic Cable Installation Litigation*, defendant AT&T Corporation has moved for summary judgment on the claims of several plaintiffs who own property adjoining railroad rights of way that were established under federal legislation to promote railroad construction in settling the American West.[1]  Acting under lease agreements with the railroads, defendant AT&T buried and is operating fiber optic telecommunications cables in the land within the right of way boundaries. Plaintiffs are private landowners.  The legal descriptions of their properties encompass some portion of one of these rights of way.  The United States issued

---

[1] This entry on the summary judgment motion applies in Cause Nos.1:99-0549-DFH-TAB (Hinshaw), 1:99-1890-DFH-TAB (Thomson), and 1:02-7000-DFH-TAB (Peterson).

land patents to plaintiffs' predecessors in interest after the railroad rights of way were established.  The land patents do not exclude the rights of way from the tracts conveyed by the patents.  Plaintiffs contend that the patents gave their predecessors property interests in the rights of way that are infringed by the cables, and plaintiffs have sued AT&T for trespass, slander of title, and unjust enrichment.  AT&T has moved for summary judgment, arguing that the land patents issued to plaintiffs' predecessors as a matter of law conveyed no interest infringed by the installation and operation of its cables.  For the reasons stated below, AT&T's motion is granted with respect to the rights of way established under the 1862 Pacific Railroad Act and the 1864 Northern Pacific Act, and denied with respect to the right of way established under the General Railroad Right of Way Act of 1875.

*Undisputed Facts*

There are no disputed facts for purposes of the motion for summary judgment.  The parties have stipulated to the following facts:

AT&T has installed and is operating fiber optic telecommunications cable in land underlying federally-granted railroad rights of way.  The portions of the rights of way at issue in this case run through parts of Kansas, Montana, North Dakota, and Colorado.

The interests in the rights of way at issue were granted to the railroads or their predecessors in interest by one of the following three statutes:  the Pacific Railroad Act of 1862, 12 Stat. 489 ("1862 Act"); the Northern Pacific Act of 1864, 13 Stat. 365 ("1864 Act"); and the General Railroad Right of Way Act of 1875, 18 Stat. 482 ("1875 Act").  Plaintiffs are private landowners.  The legal descriptions of the patents issued to their predecessors in title all encompass some portion of one of these rights of way.

Kansas Properties – The 1862 Act:  Plaintiffs Kenneth and Dolly Heiland own property in Shawnee County, Kansas.  The railroad's interest in the right of way partially included within the legal description of the Heilands' land was created by the 1862 Act.  The Heilands' predecessors in title received a patent from the United States in 1870.  Plaintiffs Viola Layman and Debra and Galen Beach also own property in Shawnee County, Kansas.  The railroad's interest in the right of way partially included within the legal description of Layman's and the Beaches' land was created by the 1862 Act.  Layman's and the Beaches' predecessor in title received a patent from the United States in 1868.

North Dakota Property – The 1864 Act:  Plaintiff Barbara Viestenz owns property in Cass County, North Dakota.  The railroad's interest in the right of way partially included within the legal description of Viestenz's land was created by the 1864 Act.  Viestenz's predecessor in title received a patent from the United States in 1876.

Montana Property – The 1864 Act:  Plaintiff Home on the Range owns property in Wibaux County, Montana.  The railroad's interest in the right of way partially included within the legal description of Home on the Range's land was created by the 1864 Act.  Home on the Range's predecessor in title received a patent from the United States in 1913.

Colorado Properties – The 1875 Act:  Plaintiffs Gene Peterson and B. B. Peterson & Son, Inc. (the "Peterson plaintiffs") own properties in Morgan County, Colorado.  The railroad's interest in the right of way partially included within the legal description of the Peterson plaintiffs' land was created by the 1875 Act.  The Peterson plaintiffs' predecessors in title received patents from the United States in 1886, 1888, 1903, and 1908.

*Discussion*

Summary judgment is appropriate if and only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  There are no disputed facts relevant to the motion for summary judgment.  The question is whether AT&T is entitled to judgment as a matter of law.

The law in this case centers on two federal statutes passed during the Civil War and one passed in the following decade.  These statutes granted right-of-way

interests and other public lands to railroad companies to facilitate private railroad construction and the settlement of the American West.  All of the plaintiffs in this case own tracts of land containing a portion of a right of way within their legal boundaries as those boundaries were described in the patents the United States government issued to their predecessors.  In each case, the railroad right of way had been granted before the original patent had issued for the plaintiffs' land.

AT&T has installed its cables within the bounds of the rights of way, but below the surface of the land.  The plaintiffs claim that the land below the surface is their land and that AT&T, by burying its cables there, has trespassed, slandered their titles, and been unjustly enriched at their expense.

Plaintiffs base their case on three main premises:  (1) their predecessors' patents conveyed legal title to the land where the cable was laid; (2) the railroads' rights of way are limited to a surface easement for railroad purposes; and (3) even if the railroads' right of way interest extends to the subsurface depth of AT&T's cables, those cables are not a railroad purpose and so exceed the scope of the rights of way and infringe plaintiffs' rights.

AT&T asserts that the plaintiffs have no legal interest whatsoever to the land where the cable was laid.  It also asserts that the cables are for a railroad purpose and so are within the scope of the right of way.

The first question is whether any of the plaintiffs have any interest in the land beneath the right of way that would support their claims against AT&T.  The relevant case law is extensive and in considerable tension.  The statutes themselves contain similar but not identical language.  As explained in detail below, however, a shift in congressional policy with respect to the railroad right of way grants occurred in 1871.  Courts have distinguished between the statutes enacted before and after that shift.  The distinction is critical in this case.  In light of the specific statutory language, controlling case law, and congressional policy, AT&T is entitled to summary judgment as a matter of law as to the rights of way established under the 1862 and 1864 Acts.  AT&T is not entitled to summary judgment on the rights of way created under the 1875 Act.

I.      *The Grants Under the 1862 and 1864 Acts*

Section 1 of the Northern Pacific Act of 1864 created the Northern Pacific Railroad Company and empowered it to construct and maintain a railroad and telegraph line between Lake Superior and Puget Sound.  Section 2 granted the right of way:

> for the construction of a railroad and telegraph, as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands adjacent to the line of said road, material of earth, stone, timber, and so forth, for the construction thereof.  Said way is granted to said railroad to the extent of 200 feet in width on each side of said railroad, where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turn-tables, and water stations. . . .

Act of July 2, 1864, 13 Stat. 356.  The language of the parallel section of the Pacific Railroad Act of 1862 is materially identical.  Act of July 1, 1862, 12 Stat. 489.

A.    *The Appropriation Doctrine*

Under the appropriation doctrine in American public land law, the land subject to the rights of way granted under the 1862 and 1864 acts was removed from the public domain when the United States granted the rights of way and the railroads were built.  Since the patents could convey only interests in land within the public domain, the plaintiffs' predecessors acquired no interest in the land subject to the right of way when they acquired their patents.

In *Wilcox v. Jackson*, 38 U.S. 498 (1839), the Supreme Court announced the appropriation doctrine in the context of government use of public land.  *Wilcox* involved land within a federal military post, Fort Dearborn in what is now downtown Chicago.  The post had been established on public land in 1804.  It had been occupied intermittently by federal troops and federal Indian agents until at least 1836.  In 1837, a settler acquired from the General Land Office in Chicago a patent for a tract of land within Fort Dearborn.  The Supreme Court held that despite the apparently valid patent, the patent holder held no title to the land because the land had been previously "appropriated" for military use.  The Court

defined "appropriated" as "nothing more nor less than setting apart the thing for some particular use." *Id.* at 512.  According to the Court:

> [W]hensoever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands; and . . . no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it; although no other reservation were made of it.

*Id.* at 513.  The patent holder therefore "acquired no title whatsoever to the land in question."  *Id.* at 515.


Numerous cases have acknowledged and followed the appropriation doctrine.  *E.g.*, *United States v. O'Donnell*, 303 U.S. 501, 510 (1938) (holding that subsequent patent did not convey lands that had previously been appropriated: "It is a familiar principle of public land law that statutes providing generally for disposal of the public domain are inapplicable to lands which are not unqualifiedly subject to sale and disposition because they have been appropriated to some other purpose. . . . The general words of the granting act are to be read as subject to such exception"), citing *Wilcox*, 38 U.S. at 513; *United States v. Minnesota*, 270 U.S. 181, 206 (1926) (cancelling patents to the extent they purported to convey tracts previously appropriated: "While the grant as extended to Minnesota was a grant *in praesenti*, it was restricted to lands which were then public.  The restriction was not expressed, but implied according to a familiar rule.  That rule is that lands which have been appropriated or reserved for a lawful purpose are

not public, and are to be regarded as impliedly excepted from subsequent laws, grants, and disposals which do not specially disclose a purpose to include them"), citing *Wilcox*, 38 U.S. at 513; *Scott v. Carew*, 196 U.S. 100, 111-12 (1905) (discussing *Wilcox*, holding that patent did not convey land previously appropriated as military post, and stating: "Many authorities might be cited to the proposition that prior appropriation is always understood to except lands from the scope of a subsequent grant, although no reference is made in the latter to the former.").

The principle of appropriation has worked both for and against the railroads. In *Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357 (1889), a homestead entry had issued on behalf of Turner in 1865, when he was a soldier. The United States then granted land to the railroad in 1867, which included Turner's tract. Turner's entry was later canceled. Whitney entered in 1877 and later received a patent. The railroad and Whitney both claimed to own the tract in question. The question before the Court was "whether . . . the homestead entry of Turner upon the land in controversy excepted it from the operation of the land grant under which [the railroad] claims title." The answer was yes. The Supreme Court explained:

> The doctrine first announced in *Wilcox v. Jackson*, 13 Pet. 498, that *a tract lawfully appropriated to any purpose becomes thereafter severed from the mass of public lands*, and that no subsequent law or proclamation will be construed to embrace it, or to operate upon it, *although no exception be made of it*, has been reaffirmed and applied by this court in such a great number and variety of cases that it may

now be regarded as one of the fundamental principles underlying the
land system of this country.

*Id.* at 360-61 (emphasis added).

For present purposes, the most important application of the appropriation
doctrine was *Northern Pacific Ry. Co. v. Townsend*, 190 U.S. 267 (1903).  A railroad
had acquired a right of way over public land by the same 1864 Act at issue in this
case.  The railroad was constructed over the land at issue in 1870 and 1871.  In
1878 and 1882, two homestead entries were issued which included within their
boundaries land subject to the right of way.  *Id.* at 269.  The settlers began
cultivating the fields inside the broad right of way.  In 1885 and 1889, the United
States issued patents to the settlers that conveyed the entries in whole, without
any exception or reservation for those portions included within the railroad's right
of way.  Townsend, who eventually held both patents, claimed title to the
cultivated land within the right of way by adverse possession.  The settlers'
cultivation of that land had continued for a time sufficient to obtain title by
adverse possession under Minnesota law.  The Minnesota Supreme Court found
in favor of Townsend.  *Id.*

The Supreme Court of the United States reversed.  The Court began its
analysis with a statement of the appropriation doctrine as applied to the patents
that did not except or reserve the right of way:

At the outset, we premise that, as the grant of the right of way, the filing of the map of definite location, and the construction of the railroad within the quarter section in question preceded the filing of the homestead entries on such section, *the land forming the right of way therein was taken out of the category of public lands subject to pre-emption and sale, and the Land Department was therefore without authority to convey rights therein.* It follows that the homesteaders acquired no interest in the land within the right of way because of the fact that the grant to them was of the full legal subdivisions.

*Id.* at 270 (emphasis added).

Although the patents on their face granted the full legal subdivisions – *i.e.*, "although no exception be made of it," *Hastings*, 132 U.S. at 361; "although no other reservation were made of it," *Wilcox*, 38 U.S. at 513 – the patents conveyed no interest to Townsend in land already taken out of the public domain by the grant of the right of way and construction of the railroad.

As for the railroad's interest, the Court went on to explain that "the fee passed by the grant made in § 2 of the [1864 Act]." 190 U.S. at 271, citing *New Mexico v. United States Trust Co.*, 172 U.S. 171, 181 (1898) and *St. Joseph & Denver City R.R. Co. v. Baldwin*, 103 U.S. 426 (1880). However, the fee was not absolute; it was conditioned on the land being used for railroad purposes. "In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Id.* On the particular question presented, since the United States' implied reversionary interest was triggered by use for non-railroad

purposes, the railroad had no right to alienate its interest in the right of way or any portion of it.  To permit an individual to gain title by adverse possession "would be to allow that to be done by indirection which could not be done directly."  *Id.*  The Court held that Townsend had no right in the right of way, notwithstanding the fact that the right of way was included in the description of the lands patented to the settlers.[2]

The Seventh Circuit recognized the reversionary interest held by the United States and followed *Townsend* much more recently in *Mauler v. Bayfield County*, 309 F.3d 997 (7th Cir. 2002).  In that case, a railroad had sold parcels to the Maulers' predecessor in title in 1884, expressly excepting the railroad's right of way.[3]  When the railroad stopped using the land as a railroad in 1978, it conveyed its interest in the right of way to the county, which dedicated it as a public trail.

The Maulers denied that the United States held a reversionary interest in the right of way.  They claimed that when the railroad stopped using the land for railroad purposes, the right of way instead was simply extinguished or reverted to them.  Therefore, according to the Maulers, the railroad's conveyance of the

---

[2]The Supreme Court did not address specifically whether a landowner in Townsend's position might have held an interest in the subsurface of the right of way.  That issue is discussed below in Part I-C.

[3]The railroad had obtained its grant from the state of Wisconsin, which had obtained the land from a grant by the United States for purposes of aiding the construction of a railroad.

right of way to the county was invalid, and the county's use of the land as a public trail was an unconstitutional taking of their private property.

In rejecting the Maulers' arguments, the Seventh Circuit described *Townsend* as "the controlling case on point." *Id.* at 999. "The *Townsend* Court . . . concluded that the railroad grant was a 'limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted.'" *Id.* at 1001, quoting 190 U.S. at 272. Because the grants at issue in *Mauler* were "given for exactly the same purpose as the grant in *Townsend*," the Seventh Circuit "readily conclude[d] that the strip of land at issue here was subject to an implied right of reverter in the United States." *Id.*

The Seventh Circuit found that three later federal statutes provided further support for the United States' reversionary interest in the right of way. Congress enacted the Abandoned Railroad Right of Way Act, 43 U.S.C. § 912, in 1922 "to dispose of the abandoned railroad lands to which the United States held a right of reverter under *Townsend*." *Id.* at 999. Section 912 required abandoned railroad rights of way to be turned into public highways within a year of abandonment or be given to adjacent landowners. The National Trails System Improvement Act of 1988, 16 U.S.C. § 1248(c), modified section 912 to require that rights of way not turned into public highways within a year of abandonment would instead revert to the United States, not to adjacent landowners. Section

913 of the Abandoned Railroad Right of Way Act permits railroad companies to convey their interests in public land grants to states, counties, or municipalities for uses as public highways or streets.  The railroad in *Mauler* conveyed its interest in the right of way to the county pursuant to section 913.

According to the *Mauler* court:  "Clearly Congress assumed the United States possessed a reversionary interest in railroad rights of way, else it would make little sense for Congress to have passed laws like §§ 912, 913 and § 1248(c) to dispose of land the federal government did not own."  309 F.3d at 1002.  The court concluded:  "When the Railroad conveyed the strip to Bayfield County and Bayfield County established a public highway on the land as required by § 913, the United States' reversionary interest expired in favor of Bayfield County.  In short, the Maulers never possessed a legal interest in the former railroad corridor." *Id.*  Accordingly, the Maulers had no valid takings claim against the county.

In this case, the plaintiffs each hold title to land for which their predecessors in title received patents issued by the United States.  All of those patents issued after the government granted the railroad rights of way at issue here.  None of those patents expressly referred to the rights of way or any implied right of reverter or other interest held by the United States.  However, under the appropriation doctrine as adopted in *Wilcox* and applied in *Hastings* and *Townsend*, among many other cases, when the rights of way at issue were granted to the railroad companies, and when the companies constructed railroads on

those rights of way, the rights of way were thereby legally appropriated for the purpose of facilitating railroad construction in the United States. The land was thus taken out of the category of public lands subject to sale. Though that fact was not stated in the original patents and also not in any subsequent deed, it was nonetheless a fact. It meant in each case that the portion of the legal subdivision included within the right of way had never been conveyed to the settlers. Accordingly, plaintiffs and their predecessors never held a legal interest in any portion of the rights of way. See *Townsend*, 190 U.S. at 270; *Hastings*, 132 U.S. at 360-61; *Wilcox*, 38 U.S. at 512; *Mauler*, 309 F.3d at 1001-02.

The plaintiffs argue that *Mauler* is irrelevant to this case because the Maulers' deed originated in a purchase from the railroad, with an *express* reservation of the right of way. According to the plaintiffs: "Unlike the Maulers, the Plaintiffs' predecessors did not acquire their land from the railroads in a private transaction, but from the federal government. . . . [W]hen the government patented out those lands it transferred all rights not explicitly reserved." Pl. Br. at 39.

This argument fails to come to grips with both *Townsend* and the *Mauler* court's reliance on *Townsend*. Like this case, *Townsend* involved land for which patents had been issued by the United States. The patents in *Townsend*, like the patents here, contained no explicit reservation of the government's right of reverter. That is why the Supreme Court in *Townsend* called the government's

interest an "*implied* condition of reverter." 190 U.S. at 271. Further, *Townsend* involved the same right of way grant as the one at issue here, which the *Mauler* court described as having the "exact same purpose" as the grant at issue in that case. In short, if *Mauler* were irrelevant to this case, then *Townsend* would have been irrelevant to *Mauler* and the Seventh Circuit would have erred in relying on it. That is not the case. The Seventh Circuit decided against the Maulers not based on the express reservation in the deed from the railroad, but because the railroad right of way grant "included an implied right of reverter to the United States under the rationale first espoused in *Townsend*." 309 F.3d at 1001.[4]

> B.     *The Patent Doctrine*

Plaintiffs all trace their titles to land patents issued by the United States government. Plaintiffs assert that "a land patent 'divests the government of title.'" Pl. Br. at 43-44, quoting *Boesche v. Udall*, 373 U.S. 472, 477 (1963) (dicta). Plaintiffs state that "*unless expressly reserved* by the United States, *all title passes in land patents to the patentee*." Pl. Br. at 43. For this proposition, plaintiffs cite *Leo Sheep Co. v. United States*, 440 U.S. 668, 678-81 (1979). *Leo Sheep* does not stand for such a sweeping proposition, which would create a conflict with the appropriation doctrine just discussed.

_____

[4]The Seventh Circuit also based its decision on an alternative holding: "[E]ven if we did not find that the United States retained a right of reverter under the original grant, the Railroad's interest in the land is now properly vested in Bayfield County" pursuant to 43 U.S.C. § 913. 309 F.3d at 1001.

The Leo Sheep Company owned odd-numbered alternating tracts of land along a former railroad right of way as successor in title to the railroad.[5] The United States owned the even-numbered tracts. When the United States cleared a road across the company's tracts to facilitate public access to government-owned tracts, the company sued to quiet title. The government argued that it had retained an implicit "easement by necessity" when it granted the land to the railroad. *Id.* at 679-80. The Supreme Court rejected the government's claim. reasoning that there was no easement by necessity because the government had recourse to eminent domain. The Court called the government's argument "somewhat strained, and ultimately of little significance." Ultimately, the Court was "unwilling to imply rights-of-way . . . *in the absence of a stronger case for their implication than the Government makes here.*" *Id.* at 682 (emphasis added). *Leo Sheep* does not bear the broad meaning attributed to it by the plaintiffs.

Plaintiffs' assertion that all title passes with an issued patent may be true so far as it goes. But plaintiffs' "patent doctrine" as applied here omits a necessary qualification: a patent can convey title only to the extent that those issuing the patent are authorized by law to convey title.

---

[5]The 1862Act, like many of the 19th century railroad right-of-way grants, divided the land surrounding the grant into alternating "checkerboard" tracts, typically of one square mile each, with odd-numbered tracts granted outright to the railroad and even-numbered tracts reserved to the government for public sale and/or homesteads.

Plaintiffs also cite *Swendig v. Washington Water Power Co.*, 265 U.S. 322, 331 (1924), for the proposition that "'when a patent is issued in accordance with governing statutes, all title and control pass from the United States.'" Pl. Br. at 44. In fact, the Court said this was "true as a general rule," but it went on to explain that this general rule would "not operate to strike down rights, subject to which, under the law, the lands are patented." 265 U.S. at 331. In *Swendig*, a power company had been granted a permit for use of a right of way in 1902 to install and operate high-tension utility lines across an Indian reservation. Between 1910 and 1918, after the reservation had been opened for homesteading and settlement, patents were issued for various tracts traversed by the company's right of way and subject to its permit. The patents involved were "absolute in form and contain[ed] no exception or reservation in respect of the power line or privileges granted appellee." *Id.* at 326. The patent holders interfered with and threatened to prevent the operation of the high-tension wires. They claimed that the issuance of the patents, which had made no express reference to the company's interests in the right of way extinguished those interests. The Supreme Court held otherwise:

> Appellants contend, and it is true as a general rule, that when, conformably to the laws, entry is made and certificate given, the land covered ceased to be a part of the public lands (*Witherspoon v. Duncan*, 4 Wall. 210, 219, 18 L. Ed. 339), and that, when a patent issues in accordance with governing statutes, all title and control of the land passes from the United States (*United States v. Schurz*, 102 U. S. 378, 396, 26 L. Ed. 167). But we hold that, under the act and the regulation made pursuant to it and in force when the patents issued, *these rules do not operate to strike down rights, subject to which, under the law, the lands are patented.* Under the permission

of the Secretary, the power line had been constructed and was maintained on the right of way over the lands in question for a long time before the reservation was opened for settlement.  *The entries were made subject to the regulations then in force. . . .  The fact that the patents did not have thereon a notation of the prior permit is not controlling.*  Under the regulation then in force, final disposal did not revoke the permit, but was made subject to the use of the right of way for the power line.  It was intended that the patent should not extinguish the earlier permission given by the Secretary.  *The issuing of the patents without a reservation did not convey what the law reserved.*

*Id.* at 331-32 (emphasis added).  *Swendig* thus offers little support to plaintiffs in this case.

In *Doolan v. Carr*, 125 U.S. 618 (1887), an action for ejectment, the question was whether extrinsic evidence was admissible at trial to establish the invalidity of a land patent.  A United States land patent had been issued in 1874 for a 320-acre tract of land in California.  That tract had previously been subject to a grant by the Mexican government when the area had been under the sovereign control of Mexico.  The Mexican grant had subsequently been confirmed by U.S. land commissioners.  The assignee of the Mexican grant sued to eject the holder of the United States patent on grounds that the patent was invalid based on the prior Mexican grant as confirmed by U.S. land commissioners.

The trial judge had excluded evidence of the Mexican grant to show the invalidity of the United States patent, accepting the patentee's argument that:

the said United States patent, and the recitals therein contained, are conclusive evidence in this action that the legal title of the lands

> therein described was granted and transferred by the United States
> to the grantee named in said patent, and, taken in connection with
> the deed from the railroad company to the [assignee of the patent], is
> conclusive evidence of the [assignee's] right to recover.

*Id.* at 624.  The trial judge then instructed the jury that "the patent title to this land . . . is conclusive in this case.  It cannot be attacked in a collateral manner. . . . I charge you the law is that, so far as this case is concerned, the patent from the government to the railroad company – the first patent introduced here – is conclusive of the rights of the parties in this case."  *Id.*

The Supreme Court, citing *Wilcox*, reversed the trial court and remanded the case for a new trial admitting evidence of the Mexican grant to test the validity of the patent.  With reasoning applicable here, the Court explained:

> There is no question as to the principle that where the officers of the
> government have issued a patent in due form of law, which on its face
> is sufficient to convey the title to the land described in it, such patent
> is to be treated as valid . . .  *subject, however, at all times to the inquiry
> whether such officers had the lawful authority to make a conveyance
> of the title.*  But if those officers acted without authority, if the land
> which they purported to convey had never been within their control,
> *or had been withdrawn from that control at the time they undertook to
> exercise such authority, then their act was void,* – void for want of
> power in them to act on the subject-matter of the patent. . . . [I]t has
> been often asserted in this court that *even a patent from the
> government of the United States, issued with all the forms of law, may
> be shown to be void* by extrinsic evidence, if it be such evidence as by
> its nature is capable of showing a want of authority for its issue. The
> decisions of this court on this subject are so full and decisive that a
> reference to a few of them is all that is necessary.  *Polk's Lessee v.
> Wendal*, 9 Cranch, 87; *New Orleans v. U.S.*, 10 Pet. 730; *Wilcox v.
> Jackson*, 13 Pet. 509; *Stoddard v. Chambers*, 2 How. 317; *Easton v.
> Salisbury*, 21 How. 428; *Reichart v. Felps*, 6 Wall. 160; *Best v. Polk*, 18
> Wall. 117; *Railroad Co. v. U.S.*, 92 U.S. 733; *Newhall v. Sanger*, Id.

761; *Sherman v. Buick*, 93 U.S. 209; *Smelting Co. v. Kemp*, 104 U.S. 636; *Steel v. Smelting Co.*, 106 U.S. 447, 1 Sup. Ct. Rep. 389; *Railway Co. v. Dunmeyer*, 113 U.S. 642, 5 Sup. Ct. Rep. 566; *Reynolds v. Mining Co.*, 116 U.S. 689, 6 Sup. Ct. Rep. 601.

125 U.S. at 624-25 (emphasis added); see also *Lake Superior Ship Canal, Ry. Iron Co. v. Cunningham*, 155 U.S. 354, 373 (1894) (citing *Wilcox* and stating: "Even a patent may be declared void if issued for lands theretofore reserved from sale. This is the settled rule of this court.").

Plaintiffs' argument that "unless expressly reserved by the United States, all title passes in land patents to the patentee," bypasses the question of whether the federal agents who issued the patents to plaintiffs' predecessors had authority to convey title to the tracts in question to the full extent claimed by the plaintiffs. In light of the appropriation doctrine, that question cannot be bypassed. In this case, those who issued patents to plaintiffs' predecessors were without authority to convey title to land previously appropriated by the government's grants of the railroad rights of way and construction of the railroad.

C.    *Surface and Subsurface Rights*

The plaintiffs also contend that even if some interest in the right of way was appropriated by the grant of the railroad right of way and later railroad construction, the appropriation was restricted to the surface of the land and did not include the underlying estate where AT&T has buried its cables. According

to plaintiffs, the unappropriated rights in the subsurface passed to their predecessors upon issuance of the patents covering the tracts in question. In effect, plaintiffs seek to have the court apply the appropriation doctrine separately to different portions of the property rights that add up to a fee simple interest in the property in question. Perhaps the surface rights were appropriated, at least to the extent needed for railroad purposes, plaintiffs contend, but the subsurface and mineral rights within the right of way were not appropriated and therefore were conveyed by the land patents to plaintiffs' predecessors.

On the issue whether the appropriation could be limited to only the surface rights, the case law is in sharp conflict. Analysis requires consideration of two Supreme Court decisions from 1942 and 1957, and then the divided authority from the circuit and district courts and some state courts.

*Great Northern Railway Co. v. United States*, 315 U.S. 262 (1942), is instructive but ultimately not controlling here to the rights of way established under the 1862 and 1864 Acts. The issue in *Great Northern* was whether a railroad's right of way established under the General Railroad Right of Way Act of 1875 gave the railroad the right to drill for oil and gas within the right of way. The answer was no, that the United States retained rights to oil and gas under the right of way created under the 1875 Act. Justice Murphy's opinion for the Court explained the important shift in federal policy toward railroads that occurred in 1871. Prior to that time, the government had been generous in its land grants to

railroad companies that built roads urgently needed to connect California, Washington, and Oregon to the eastern states during and immediately after the Civil War.  See *United States v. Union Pacific Railroad Co.*, 91 U.S. 72, 79-82 (1875) (describing 1862 Act as "outside of the usual course of legislative action concerning grants to railroads," in light of war and need to encourage private capital investment in hazardous project of constructing 2000-mile long railroad across deserts, mountains, and Indian territory); see also *Great Northern*, 315 U.S. at 273 (describing congressional policy beginning in 1850 of "subsidizing railroad construction by lavish grants from the public domain"), and quoting Congressional Globe, 42nd Congress, 2nd Sess. 1585 (1872) (resolution stating that subsidized grants of public lands to railroads should be discontinued and public lands should be held "for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law").  Later, however, in the wake of the Credit Mobilier scandal, public opinion shifted. Congress enacted statutes with less lavish grants, culminating in the General Railroad Right of Way Act of 1875.

In *Great Northern*, the Supreme Court concluded that the 1875 Act authorized "only an easement," as distinct from the "limited fee" that *Townsend* found under the 1864 Act.  Since mineral rights ordinarily are not conveyed with an easement for a right of way, the government retained the rights to oil and gas. 315 U.S. at 279.  *Great Northern* did not address the issue presented here, which is a dispute between the rights of the railroad (and its lessee AT&T) and the rights

of landowners who received patents from the government.  At the end of the opinion in *Great Northern*, the Supreme Court limited the effect of its decision to portions of the right of way within Glacier National Park, which had not been patented to private persons and where there was no doubt that the United States retained title of the servient estate.  315 U.S. at 280 & n.22.  As a result, the Court did not address whether private landowners or the government held oil and gas rights within the right of way, which was an issue that private landowners had tried to raise by intervening in the lower courts.  See *MacDonald v. United States*, 119 F.2d 821, 827-28 (9th Cir. 1941) (affirming denial of intervention where government prevailed on issue of interest to proposed intervenor).

While *Great Northern* dealt with rights of way under the 1875 Act, *United States v. Union Pacific Railroad Co.*, 353 U.S. 112 (1957), dealt with oil and gas rights for a right of way under the 1862 Act.  The Court held that the right of way did not include subsurface mineral rights, which were reserved by the United States.  In dicta, the Court discussed *Townsend* and other cases that characterized the railroad's interest as a limited fee, limited by only an implied right of reverter:  "The most that the 'limited fee' cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes."  *Id.* at 119.  From this language, plaintiffs argue that the rights that did not pass to the railroad passed to the plaintiffs' predecessors when the government issued patents to the land in question.  The court disagrees.

*Union Pacific* was a contest between the United States and the railroad concerning the scope of the government's grant to the railroad.  Both in its express holding and in the dicta concerning *Townsend* , the Court clarified some limits on what was granted to the railroads in the right-of-way grants.  Nothing in that case, however, suggests that what was *appropriated* by setting aside lands for rail construction – and thereby severed from the public domain – was limited to that which was granted to the railroad by the right of way grant.  That question simply was not raised.  Neither the Supreme Court's opinion nor the lower courts' opinions indicate that any of the land in question had been conveyed by patent to any private party.  In other words, even if AT&T's buried cables exceed the scope of the right of way grant,  the question remains whether they infringe any right held by the plaintiffs.

In the wake of *Great Northern* and *Union Pacific*, the lower courts have reached conflicting results as to whether the land appropriated by creating railroad rights of way under the 1862 and 1864 Acts was appropriated entirely, so that owners of the adjoining land received no rights in the subsurface or mineral rights, or whether the appropriation was limited to the surface rights for railroad purposes, so that patents that included the rights of way transferred the servient estate to settlers like the predecessors of the plaintiffs in this case.

AT&T relies on *Wyoming v. Udall*, 379 F.2d 635 (10th Cir. 1967 ), *Rice v. United States*, 479 F.2d 58 (8th Cir. 1973), and *Kunzman v. Union Pacific Railroad*

*Co.*, 456 P.2d 743 (Colo. 1969).  In *Wyoming v. Udall*, the state of Wyoming held title to lands through which an 1862 Act right of way passed.  The Tenth Circuit held that the state was not entitled to oil and gas within the boundaries of the right of way.  Those rights were retained by the United States government.  In reaching that conclusion, the court emphasized how extensive the railroad's rights were, which effectively supports the conclusion that the entire property within the boundaries of the right of way was appropriated, meaning it was removed from the public domain subject to further disposition.  The railroad's "limited fee" gave it the right to occupy the surface of the land permanently and exclusively.  As amended in 1864, see 13 Stat. 356, the Act gave the railroad the right to explore for, develop, and mine the right of way itself for coal and iron.  379 F.2d at 640.  Such an expansive right in the land meant that the entire property within the right of way was effectively appropriated for railroad use and removed from the public domain.

*Rice v. United States*, 479 F.2d 58 (8th Cir. 1973), adopted the opinion of Judge Van Sickle in the district court, 348 F. Supp. 254 (D.N.D. 1972).  The issue was  ownership of the oil and gas under the right of way granted under the 1864 Act.  Plaintiffs' predecessors had received homestead patents to tracts through which the right of way passed.  The patents did not mention the railroad's right of way.  The plaintiffs argued that they were entitled to the oil and gas on the theory that the patents had conveyed the servient estate.  The government argued that the right of way had appropriated the land so as to remove it from the public

domain.  The court agreed with the United States, observing that no reasonable homesteader in the nineteenth century would have expected to acquire any rights within the right of way itself on the theory that only the surface had been appropriated:

> As pointed out in *Hastings*, this rule [the appropriations doctrine announced in *Wilcox*] was of wide general knowledge and application. Any informed advisor, or homesteader must surely have been cognizant of the rule.  Therefore, the Homesteader cannot reasonably have claimed that in taking a homestead subject to a railroad right of way, he acquired an interest under the right of way.

*Rice v. United States*, 348 F. Supp. 254, 257 (D.N.D. 1972), aff'd and opinion adopted, 479 F.2d 58, 59 (8th Cir. 1973).[6]

Plaintiffs rely on *Energy Transportation Systems, Inc. v. Union Pacific Railroad Co.*, 606 F.2d 934 (10th Cir. 1979) ("*ETSI-10*"), and *Energy Transportation Systems, Inc. v. Union Pacific Railroad Co.*, 619 F.2d 696 (8th Cir. 1980) ("*ETSI-8*").  Both decisions held that railroad rights of way under the 1862 Act appropriated only the surface of the right of way for a railroad use, such that the servient estate could still be conveyed by a patent to the settlers.  Both *ETSI* cases dealt with an

---

[6]AT&T also relies on *Kunzman v. Union Pacific Railroad Co.*, 456 P.2d 743 (Colo. 1969), in which the plaintiff landowners' title derived from a patent to land through which an 1862 Act right of way ran.  The railroad leased a portion of its right of way to the state highway department for use as a highway, and the plaintiffs sued, arguing that the use of the right of way was not permissible.  The Colorado Supreme Court followed *Townsend* and held that the plaintiffs had no interest in the right of way at all, under the appropriation doctrine.  456 P.2d at 745-46.  Since the case involved a dispute only over use of the surface of the right of way, it provides less strong support than *Wyoming v. Udall* and *Rice.*

effort to construct a coal slurry pipeline from Wyoming to Arkansas.  The planned pipeline needed to cross railroad rights of way established under the 1862 Act.  Union Pacific Railroad refused permission to build the pipeline underneath its tracks.  ETSI then obtained permission from owners of land through which the railroad rights of way passed.  District courts in Wyoming, Kansas, and Nebraska held that the owners had the right to grant the pipeline easement, so long as the pipeline did not interfere with the railroad's use of its right of way.  The Tenth Circuit and Eighth Circuit affirmed all the decisions.

The Tenth Circuit reasoned that the grant of the right of way did not result in appropriation of the land within its boundaries, so that the United States retained an interest in the servient estate, which it conveyed with the patents.  *ETSI-10*, 606 F.2d at 936-37.  The district court in the Wyoming case had used Professor Hohfeld's classic image of property rights to explain:

> Out of what Professor Hohfeld said was a "complex aggregate of rights (or claims), privileges, powers and immunities" (26 Yale Law Journal 746) that we call "land," Congress granted the railroad exclusive use of the surface of the right of way, with broad and extensive rights of sub-lateral and subjacent support to prohibit interference with railroad operations and maintenance; but, from that Hohfeldian bundle of sticks, Congress held back some, like the right of reverter and the subsoil and mineral rights except where the lands were "coal or iron lands."  The lands in question are not within the latter category.  That it granted only an easement for the right of way cannot be gainsaid.

*Energy Transp. Systems, Inc. v. Union Pac. R. Co.*, 435 F. Supp. 313, 317 (D. Wyo. 1977).  The Tenth Circuit and Wyoming district court decisions did not address

directly the scope of the appropriation doctrine.  The district court recognized that its reasoning conflicted with the Tenth Circuit's decision in *Wyoming v. Udall*, but tried to avoid its effect by treating that case as "unique and not controlling" because it dealt with school lands granted to the state under the Wyoming Enabling Act.  435 F. Supp. at 317-18.  That explanation did not address the *Udall* court's conclusion that creation of a railroad right of way under the 1862 Act appropriated the land and removed it entirely from the public domain.  The Tenth Circuit opinion in *ETSI* cited and quoted *Udall* but did not address at all the scope of the appropriation in that case.[7]

In *ETSI-8*, the Eighth Circuit followed the reasoning of the Tenth Circuit. The Eighth Circuit summarized its earlier decision in *Rice* but did not address the direct conflict in terms of whether the appropriation covered all the land in the boundaries of the right of way (as in *Rice*), or was instead limited to the surface rights, so that the United States could issue a patent that conveyed the servient estate within those boundaries, as in *ETSI-10*.

This court respectfully believes that the sounder view of the appropriation doctrine is stated in *Wyoming v. Udall* and *Rice v. United States*.  When the government established rights of way under the 1862 and 1864 Acts, it

---

[7]The Kansas cases before the Tenth Circuit in *ETSI* presented different issues because the lands in question had originally been granted to the railroad in fee as part of the land grant under Section 3 of the 1862 Act.  See 606 F.2d at 937-38.

unquestionably appropriated the surface of the land, and its grant to the railroad contained an implied right of reverter that, for reasons explained above, did not pass with the patents.  *Townsend*, 190 U.S. at 270; *Hastings*, 132 U.S. at 360-61; *Wilcox*, 38 U.S. at 512; *Mauler*, 309 F.3d at 1001-02.  But the appropriation encompassed much more than mere rights of entry and passage over the surface. As a practical matter, any railroad right of way necessarily involves a permanent and exclusive use of the land that is much different from a medieval right of way that authorized merely taking horses or wagons across a field.  *E.g., Western Union Telegraph Co. v. Penn. R.R. Co.*, 195 U.S. 540, 570 (1904) ("A railroad right of way is a very substantial thing.  It is more than a mere right of passage.  It is more than an easement."); *New Mexico v. United States Trust Co.*, 172 U.S. 171, 183 (1898) ("surely more than an ordinary easement was granted, – one having the attributes of the fee, perpetuity and exclusive use and possession"); *Udall*, 379 F.2d at 640 (calling railroad rights of way an "expansion" of common law easement).

The rights of way granted by the 1862 and 1864 Acts are no exception.  For example, the 1862 Act granted to the company the right "to take from the public lands adjacent to the line of said road, earth, stone, timber and other materials for the construction" of the railroad.  The Act also contemplated that the company would erect "stations, buildings, workshops, and depots, machine shops, switches, sidetracks, turntables and water stations."  12 Stat. 489.  The 1864 Act contained essentially identical language.  These uses, including construction of

the rail line itself, all involve encroachment into the underlying estate to some depth.  Under the 1862 Act, as amended in 1864, moreover, the railroads even acquired the right to explore within the right of way for coal and iron and to mine any they found, thus authorizing even greater rights below the surface of the land. See *Wyoming v. Udall,* 379 F.2d at 640.

An appropriation is "nothing more nor less than setting apart the thing for some particular use." *Wilcox,* 38 U.S. at 512.  In this case, the United States set the lands in question apart for the particular use of railroad construction and operation.  The right of way was a grant of "corporeal, not incorporeal property." *New Mexico v. United States Trust Co.*, 172 U.S. at 183.  It had the attributes of "perpetuity and exclusive use and possession." *Id.*  "The right acquired by the railroad company . . . requires for its enjoyment a use of the land permanent in its nature and practically exclusive." *Id.* (quotation omitted).  The grant also authorized construction of permanent structures and other improvements.  See *United States v. Fitzgerald*, 40 U.S. 407, 416 (1841) ("[W]herever there is a *real and permanent use* of a part of the public domain for a public purpose, it is such an appropriation of it as the law intended")  (emphasis added), citing *Wilcox,* 38 U.S. at 511-12.

In addition to this real and permanent occupation of the surface of the right of way, Congress reserved the mineral rights in the underlying estate to the United States.  These rights would encompass the rights to mine minerals, and to drill for

gas and oil, or to lease those rights to others.  *E.g.*, Act of May 21, 1930, 46 Stat. 373, 30 U.S.C. § 301 (authorizing U.S. Secretary of the Interior to lease oil and gas deposits underlying railroad rights of way).  Moreover, under the 1862 Act, as amended in 1864, the government's specific reservation of mineral rights "shall not be construed to include coal and iron land."  Act July 1, 1862, § 3, 12 Stat. 489 as amended by Act July 2, 1864, 13 Stat. 358.  Accordingly, the railroad received subsurface rights.  These subsurface rights were expansive:

> [T]he railroad not only received a right-of-way with perpetual and exclusive use of the surface but also received a right to explore for, develop, and mine the underlying coal and iron. . . . The question of whether coal and iron are now known, or ever have been known, to underly the right-of-way is immaterial.  The railroad has the right to explore for coal and iron and if any is discovered it belongs to the railroad.  Such a right is in a different category from a surface easement.  The grant of the coal and iron with the incidental rights of exploration and development *disposed of* a part of the section traversed by the right-of-way.

*Udall*, 379 F.2d at 640 (emphasis added).  Such expansive subsurface rights are inconsistent with the underlying estate remaining in the unappropriated public domain, especially as they were granted or reserved appurtenant to the right to occupy the surface so substantially, exclusively, and permanently.

The Supreme Court's cases applying the appropriation doctrine do not speak in terms of specific property rights being appropriated from a given property, like removing individual sticks from a Hohfeldian bundle.  The appropriation doctrine cases speak in terms of "tracts" or "land" being removed

from the "mass" or "category" of public lands.  See *Wilcox*, 38 U.S. at 513, 515
("[W]hensoever a tract of land shall have once been legally appropriated to any
purpose, from that moment the land thus appropriated becomes severed from *the*
*mass* of public lands. . . . [The patentee] acquired no title whatsoever in the land
in question"); *Hastings*, 132 U.S. at 360 ("a tract lawfully appropriated to any
purpose becomes thereafter severed from the mass of public lands"); *Townsend*,
190 U.S. at 270 ("the land forming the right of way therein was taken out of the
category of public lands"); *United States v. O'Donnell*, 303 U.S. 501, 510 (1938)
("statutes providing generally for disposal of the public domain are inapplicable
to lands which are not unqualifiedly subject to sale and disposition because they
have been appropriated to some other purpose"); *Scott v. Carew*, 196 U.S. 100,
111-12 (1905) ("prior appropriation is always understood to except lands from the
scope of a subsequent grant"); *United States v. Minnesota*, 270 U.S. 181, 206
(1926) (The "rule is that lands which have been appropriated or reserved for a
lawful purpose are not public"); *Lake Superior Ship Canal, Ry. Iron Co. v.*
*Cunningham*, 155 U.S. 354, 373 (1894) ("these lands were identified, separated
from the public domain, appropriated to a particular purpose").

Regardless of whether the limited fee concept articulated in *Townsend* was
limited to surface rights and rights incident to railroad uses, and regardless of
exactly how mineral rights were allocated between the railroad and the United
States government, the land within the railroad rights of way was clearly set aside.
It was appropriated.  Under *Wilcox* and the consistent line of Supreme Court

precedent following it, the land – surface and subsurface – therefore was severed from the category of public lands and did not pass with the patents even though the patents made no express exception for the rights of way.

In this case, Congress appropriated the land in question, surface and subsurface, when it set aside the land to facilitate railroad construction and allocated to the railroad expansive exploration and development rights to subsurface resources. The result was a grant of a permanent and exclusive right to occupy the land in question. That right is so substantial, permanent, and exclusive as to have appropriated the entire tract covered by the right of way from the public domain, so that later patents did not convey any rights within the boundaries of the right of way.

Under this analysis, the court need not determine whether AT&T buried its cables close enough to the surface to be within the railroad's surface rights or so deeply as to be within subsurface rights retained by the government. The critical point is that the plaintiffs before the court whose properties adjoin railroad rights of way granted under the 1862 Act and the 1864 Act do not have any rights that are infringed by the installation of the cables within the boundaries of the rights of way. AT&T is entitled to summary judgment on the claims involving the rights of way created under the 1862 and 1864 Acts.

II.     *The Post-1871 Grants*

The Peterson plaintiffs own properties in Morgan County, Colorado. The railroad's interest in the right of way that crosses their properties was created by the General Railroad Right of Way Act of 1875, 18 Stat. 482. The law applicable to that right of way differs substantially from that applicable to the pre-1871 acts, and produces a different outcome here.

A.   *Appropriation v. Easement*

As discussed above, in *Great Northern Railway Co. v. United States*, 315 U.S. 262 (1942), the Supreme Court held that the 1875 Act granted rights of way that were only easements, not fee interests, so that the railroad did not receive rights to oil and gas within the right of way. The Court distinguished between rights of way granted under the pre-1871 statutes, which had been described as "limited fees" in *Townsend*, and the less generous grants after 1871. 315 U.S. at 277-78. In reaching its conclusion, the Court relied on Section 4 of the 1875 Act, which provided that "lands over which such right of way shall pass shall be disposed of subject to such right of way." *Id.* at 278. If the railroads held a fee interest as they did under earlier statutes, the lands could not be disposed of at all. The 1875 provision for disposal subject to such right of way clearly contemplated that the tracts within those boundaries had not been appropriated in their entirety, so that the government could dispose of its interest in the servient estate.

AT&T argues that the appropriation doctrine applies to rights of way created under the 1875 Act just as it does to those created under the 1862 and 1864 Acts. According to AT&T, when the United States granted rights of way pursuant to the 1875 Act, it set aside the land for railroad purposes, thereby appropriating it under the rule of *Wilcox*.  In support of this argument, there is little practical difference between the railroad's permanent and exclusive possession of the surface of the land whether the law deems its interest an easement or a limited fee.

Despite the practical similarity, the different language of the 1875 Act and the intent of Congress dictate a contrary conclusion.  Section 4 of the 1875 Act shows that Congress did not intend to appropriate the right of way such that the land would be removed from the public domain in its entirety.  Section 4 provided that the location of each railroad right of way granted under the Act shall be noted on the plats in the local land office, and that "thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way." The pre-1871 acts contain no analogous provision.  The Supreme Court explained in *Great Northern*:  "This reserved right to dispose of the lands subject to the right of way is wholly inconsistent with the grant of a fee."  315 U.S. at 271.  The reserved right to dispose of the lands subject to the right of way is equally inconsistent with the proposition that the 1875 Act appropriated the land in question, severing it from the public domain that could be disposed of by issuing land patents.

In *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005), the Federal Circuit faced, among many questions, the question faced here:  "whether, for the segments of rights-of-way granted over public lands in accordance with the 1875 Act, the ownership of the underlying land remained with the United States for lands subsequently patented to settlers under the Homestead Act."  *Id.* at 1313. In finding that the underlying land did not remain with the United States but instead passed with the patents, the Federal Circuit explained:

> The 1875 Act contemplated that public land carrying a railway right-of-way would be "disposed of," and provided that existing rights-of-way would be preserved if they were registered in the Interior Department's local land office.  Section 4 of the 1875 Act . . . recognized that:
>> all such lands over which such right of way shall pass shall be disposed of subject to such right of way.
>
> 43 U.S.C. § 937.  By making the disposition of such lands "subject to" the right-of-way, the Act explicitly negated the theory that these lands were not included in the "disposition." To the contrary, the Act recognized the future disposition of the lands over which the right-of-way passes.

*Id.* at 1314.[8]  See also *Chicago & North Western Ry. Co. v. Continental Oil Co.*, 253 F.2d 468 (10th Cir. 1958) (oil and gas within right of way under 1875 Act belonged not to railroad but to private owner of the servient estate, who had leased oil and gas rights to Continental Oil); *Beres v. United States*, 64 Fed. Cl. 403, 427 (2005) (holding that patents to lands over which rights of way created under 1875 Act passed conveyed the servient estate in the right of way).

Section 4 of the 1875 Act thus undercuts AT&T's argument that the 1875 Act appropriated the land affected by the grant, severing it from the public domain that was available for homesteading or other grants.

Other differences between the pre- and post-1871 statutes further undercut AT&T's appropriation argument as applied to the 1875 Act.  The pre-1871 statutes

_____

[8]The *Hash* court further cited a "contemporaneous Interior Department regulation [which] reinforces this view of the statute.  This regulation describes the legal structure of the railway's right-of-way under the 1875 Act, and the fee simple title conveyed to the patentee of the land[.]"  403 F.3d at 1314.  The regulation provided in part:

> A railroad company to which a right-of-way is granted does not secure a full and complete title to the land on which the right-of-way is located. It obtains only the right to use the land for the purposes of which it is granted and for no other purpose. . . .  *The Government conveys the fee simple title in the land over which the right-of-way is granted to the person to whom patent issues for the legal subdivision on which the right-of-way is located, and such patentee takes the fee subject only to the railroad company's right of use and possession.*

*Id.* at 1314-15, quoting 43 C.F.R. § 2842(a) (1909) (emphasis added) (repealed by the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1701 *et seq.*).

contain provisions whereby lands covered by homestead or similar claims at the time of the grant are expressly excluded from the operation of the outright grants in fee of alternate sections to the railroad under the checkerboard scheme. This express exclusion was consistent with an intent to appropriate under the pre-1871 acts. The government could not appropriate previously appropriated land. *Wilcox*, 38 U.S. at 513.

The 1875 Act contained no such provision, of course, because it provided for no outright grants in fee. However, the 1875 Act did contemplate the likelihood of conflict with existing homestead or similar claims. Section 3 of the 1875 Act provided in part that "private lands and possessory claims on the public lands of the United States may be condemned." 18 Stat. 482. The 1875 act was "intended to include lands of that class, but with the qualification, plainly implied in the third section, that due compensation must be made to the claimants for their inchoate or possessory rights to make the grant operative against them." *Great Northern Ry. Co. v. Steinke*, 261 U.S. 119, 127 (1923). This qualified *inclusion* within the operation of the 1875 Act of homestead and similar claims beyond the reach of appropriation indicates that Congress did not intend to invoke the full power of appropriation under the 1875 Act rights of way. The government could not appropriate previously appropriated land, but it could always use the power of eminent domain to condemn it for a public purpose, such as a railroad that would serve a broad public purpose.

Accordingly, under the 1875 Act, the lands over which the rights of way passed could be disposed of by patents.  In this case, the predecessors in interest of the Peterson plaintiffs received patents for tracts of land over which the right of way passed.  The land within the boundaries of the right of way had not been appropriated and removed from the public domain, so those predecessors received property rights in the servient estates.

In opposing this result, AT&T relies on several cases, but they do not persuade the court that the 1875 Act's rights of way are identical to those granted under the 1862 and 1864 Acts.  *Boise Cascade Corp. v. Union Pacific Railroad Co.*, 630 F.2d 720 (10th Cir. 1980), dealt only with surface rights within the right of way.  A lumber company was the successor in interest to a "school section" that the state of Utah had received from the federal government upon gaining statehood.  A right of way passed through the tract.  The lumber company had built a lumber yard and other improvements within the boundaries of the right of way.  In holding that the railroad retained rights to exclusive use and possession of the surface within the right of way, the court did not find that the lumber company had no subsurface or mineral rights.  The question presented here simply did not arise in the case.

AT&T finds stronger but ultimately insufficient support in *Idaho v. Oregon Short Line Railroad Co.*, 617 F. Supp. 207 (D. Idaho 1985).  Several parties were contesting the status of a railroad right of way granted under the 1875 Act.  The

district court held that the United States had retained a reversionary interest in the right of way such that the right of way would upon abandonment be available for use as a public highway pursuant to 43 U.S.C. § 912 and 23 U.S.C. § 316. The statutes, enacted in 1922 and 1921, respectively, assumed that the United States retained a reversionary interest in the right of way, which was consistent with the Supreme Court's decision in *Rio Grande Western Ry. Co. v. Stringham*, 239 U.S. 44 (1915), which described rights of way under the 1875 Act as limited fee interests, as *Townsend* had described rights of way under the 1864 Act.  In *Great Northern*, however, the Supreme Court had overruled *Stringham* on this point.  The district court in *Oregon Short Line* correctly observed that *Great Northern* had not decided whether the United States had retained a reversionary interest in the right of way itself, such that an abandoned right of way could be used for public highways.  617 F. Supp. at 211-12.

In holding that the United States had retained such a reversionary interest, the *Oregon Short Line* court was addressing only the use of the right of way itself, without addressing ownership of the servient estate.  The court's observations about the relationship between *Great Northern* and *Union Pacific* are accurate so far as they go.  The court did not address and did not need to address the significance of Section 4 of the 1875 Act and its provision that lands over which the rights of way would pass could be disposed of subject to the right of way, which clearly implied that the appropriation doctrine would not apply to the servient estate.

AT&T also relies on *Whipps Land & Cattle Co. v. Level 3 Communications, LLC*, 658 N.W.2d 258 (Neb. 2003), in which a railroad allowed a telecommunications company to install fiber optic cable within the boundaries of a right of way created under the 1875 Act.  The plaintiff in the case derived its title from a government patent that was issued after the right of way was established.  The plaintiff sued for trespass, arguing that it owned the servient estate over which the right of way passed.  The Nebraska Supreme Court held that the owner had no interest in the right of way, so that installation of the cable did not trespass on its property.  The court relied on *Oregon Short Line* and its conclusion that the United States retained a reversionary interest in the right of way itself, as implied in 43 U.S.C. § 912, which provided that an abandoned railroad right of way could be converted to a public highway within a year, or it would expire such that the owner of the servient estate would be free of the right of way.   See 658 N.W.2d at 265-66.   Again, however, this reasoning fails to distinguish between a reversionary interest in the right of way itself and an interest in the underlying servient estate.  For that reason, the court is not persuaded by *Whipps Land & Cattle* that the Peterson plaintiffs have no rights in the servient estates that include the subsurface.[9]

_____

[9]The Nebraska court cited several other cases dealing with similar issues of reversionary interests in the 1875 Act rights of way themselves, as distinct from interests in the servient estate pursuant to a land patent.  *E.g.*, *Vieux v. East Bay Regional Park Dist.*, 906 F.2d 1330 (9th Cir. 1990), and *Barney v. Burlington Northern R.R. Co.*, 490 N.W.2d 726 (S.D. 1992); contra, *City of Aberdeen v. Chicago & Northwestern Transp. Co.*, 602 F. Supp. 589 (D.S.D. 1984).  These cases are instructive on issues arising from efforts to convert abandoned railroad rights of way to recreational trails and other similar purposes.  They do not address the
(continued...)

AT&T also relies on *Klump v. MCI Telecommunications Corp.*, No. CIV 01-421 TUC ACM (D. Ariz. March 25, 2003), which also addressed the installation of fiber optic cables in a railroad right of way created under the 1875 Act. The court concluded that the plaintiff, whose predecessors had received a patent to the tract through which the right of way passed, had no interest in the right of way. The court appears to have applied the appropriation doctrine: "By the time the United States conveyed the homestead interest in the public lands to Klump's predecessor-in-interest, all property rights in the right-of-way were exhausted and removed from the public domain." Slip op. at 5. In support of this conclusion, the court cited *Rice v. United States*, 479 F.2d 58 (8th Cir. 1973), and *Kunzman v. Union Pacific Railroad Co.*, 456 P.2d 743 (Colo. 1969). Both of those cases are discussed above, and both applied the appropriation doctrine to rights of way created under the 1862 and 1864 Acts. Accordingly, they offer little support for applying the appropriation doctrine to rights of way under the 1875 Act. The court in *Klump* did not focus on the differences between the different statutes, including the important language in Section 4 of the 1875 Act authorizing disposition of the lands over which the rights of way would pass. Accordingly, *Klump* also does not persuade the court to reach a different result.

---

[9](...continued)
question whether patents to lands over which the rights of way passed conveyed any interest in the servient estate within the boundaries of the right of way, or whether all the land within the right of way was appropriated and thus removed from the public domain that could be disposed of by patent. The Nebraska court also cited *Marshall v. Chicago and Northwestern Transp. Co.*, 31 F.3d 1028 (10th Cir. 1994), which actually held that an abandoned railroad right of way reverted to the owners of the servient estate pursuant to 43 U.S.C. § 912.

In sum, both sides' efforts to erase the differences between the pre- and post-1871 statutes are unpersuasive.  Under the 1862 and 1864 Acts, the appropriation doctrine served to remove the land over which the rights of way passed from the public domain, so that plaintiffs Home on the Range, the Heilands, Viestenz, Layman, and the Beaches do not have rights in the land within the boundaries of the rights of way.  Under the 1875 Act, the appropriation doctrine did not apply to remove from the public domain the lands of the Peterson plaintiffs' over which the rights of way passed.

B.     *The Scope of the Grant Under the 1875 Act*

The next issue is whether the installation of AT&T's cables through the Peterson properties was within the scope of the right of way granted under the 1875 Act.  The 1875 Act states in pertinent part:

> Section 1. That the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any state or territory, except the District of Columbia, or by the Congress of the United States, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation, and due proofs of its organization under the same, to the extent of one hundred feet on each side of the central line of said road; and also the right to take, from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said railroad; also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road.

18 Stat. 482.

AT&T points out:  "Given that the purpose of all this legislation was to develop western lands, it is hard to imagine why Congress would forbid utilities from using these corridors to bring telephone, electricity, or other modern services to the areas served by the rights of way."  Def. Reply at 12.  AT&T also argues with respect to the pre-1871 statutes that its telecommunications cables are permissible as logically within the scope of the grants' express mandate for the railroad to install telegraph lines.  However, the 1875 Act does not expressly mandate, authorize, or otherwise refer to telegraph construction.

AT&T's argument encounters "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59 (1983), quoting *Union Pacific*, 353 U.S. at 116; see also *Caldwell v. United States*, 250 U.S. 14, 20 (1919) ("statutes granting privileges or relinquishing rights are to be strictly construed; or, to express the rule more directly, that such grants must be construed favorably to the government and that nothing passes but what is conveyed in clear and explicit language – inferences being resolved not against but for the government"); *Kean v. Calumet Canal & Improvement Co.*, 190 U.S. 452, 498 (1903) (White, J., dissenting) ("A grant by the United States is . . . not subject to be enlarged by any principle of conveyance beyond the express intendment of the statute under the authority of which the grant is made. . . . [G]rants of the government are to be strictly construed in its favor and against the grantee; in other words, that nothing passes by the grant but that which is necessarily and expressly embraced in its terms."); *Sioux City & St. P. R. Co. v. United States*, 159 U.S. 349, 360 (1895) ("If the terms of an act of congress, granting public lands, admit of different meanings – one of extension and the other of limitation – they must be accepted in a sense favorable to the grantor"); *Barden v. Northern Pacific R. Co.*, 154 U.S. 288, 319 (1894) (stating as "settled rule" applicable to construction of railroad grants that "nothing will pass to the grantee, by implication or inference, unless essential to the use and enjoyment of the thing granted").

None of these iterations of the general rule governing construction of grants accommodates the interpretation of the 1875 Act sought by AT&T. The court can easily assume that installation within the rights of way of telegraph or other communications technology for the purpose of facilitating the operation of the railroad itself was within the intention of Congress despite the absence of express language to that effect. See *Great Northern*, 315 U.S. at 277 (favorably citing act of Congress describing 1875 Act as granting "an easement or use for railroad purposes"). However, no argument has been made and nothing in the record before the court suggests that AT&T's cables in any way further a purpose of the railroad itself.[10]   And if the cables did further a purpose of the railroad, the question would remain whether leasing the rights to a third party, as the railroad here did, is within the scope of its granted rights.

AT&T argues for a more liberal rule of railroad grant construction than those cited above. According to AT&T, the railroads "may use their federally granted right of way for *any purpose not inconsistent with* railroad operations." Def. Br. at 15. AT&T finds support for this view in a January 5, 1989, opinion memorandum issued by an attorney for the Department of the Interior. 96 Interior Dec. 439, 1989 WL 434834 (D.O.I.). The Interior memorandum discussed whether the pre- and post-1871 acts granted railroads the right to authorize an unrelated company like AT&T to install a fiber optic communication

_____

[10]Under AT&T's expansive assertion that "the purpose of all this legislation was to develop western lands," it is hard to imagine anything the railroads would be unauthorized to do within the right of way.

system on and beneath the surface of the rights of way where they cross public land without permission from the Bureau of Land Management.  The issue was the same as here:  the scope of the railroad's rights under the grants.  With regard to the 1875 Act, the Interior memorandum stated:

> Under the 1875 Act, railroads were granted an "easement."  The scope of this easement, unlike an ordinary common-law easement, is an interest tantamount to fee ownership, including the right to use and authorize others to use (where *not inconsistent with* railroad operations) the surface, subsurface, and airspace.

*Id.* at *10 (emphasis added).

The Interior memorandum did not cite any law for this proposition, which effectively ignores the Supreme Court's decision in *Great Northern*, which took pains to distinguish between the "limited fee" granted by pre-1871 statutes and the easements granted by later statutes.  The bold statement appears in a section entitled "Summary."  The only possible source of the quoted statement is Justice Frankfurter's dissent in *Union Pacific*, discussed in the body of the memo.  The Interior memorandum quotes Justice Frankfurter:

> The *Townsend* case also serves to refute the suggestion that the railroad in its use of the right of way is confined to what in 1957 is narrowly conceived to be "a railroad purpose" . . . The Court [in *Townsend*] recognized that the land could revert to the grantor only in the event that it was used in a manner *inconsistent with the operation of the railroad* . . . Had Congress desired to make a more restrictive grant of the right of way, there would have been no difficulty in making the contingency for the land's reversion its use of any purpose other than one appropriately specified.

*Id.* at *7, quoting *Union Pacific*, 353 U.S. at 131-32 (Frankfurter, J., dissenting) (emphasis added).

Justice Frankfurter, of course, was referring to the pre-1871 grants when he wrote that statement, so it offers little support for the conclusions of the Interior memorandum regarding the 1875 Act. In fact, Justice Frankfurter noted that the 1875 Act "was significantly different from the Act of 1862 and its companions." 353 U.S. at 127. He cited *Great Northern* and noted the "strong differentiating factors" that made the pre-1871 acts more liberal in what they granted than the 1875 Act. *Id.* at 127-28.[11]

In any case, the majority in *Union Pacific* stated:

> [T]his right of way was granted Union Pacific "for the construction of said railroad and telegraph line." [Section 2 of the Act]. *That purpose is not fulfilled* when the right of way is used for *other purposes*. See *Northern Pacific R. Co. v. Townsend*, [190 U.S. 267, 271 (1903)]. It would seem that, whatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is *not a railroad purpose*.

*Id.* at 114 (emphasis added). The Supreme Court did not state or imply as a basis for its holding that drilling for oil was inconsistent with railroad purposes. Rather, drilling for oil simply was not a railroad purpose. Cf. *Use of a Right of Way for*

---

[11]These factors included the absence of outright land grants and direct subsidies in the 1875 grant, the absence of a right to exclude other railroads from narrow passes, and especially the provision (Section 4) providing for the subsequent disposal of the land subject to the right of way, as recognized in *Great Northern*. *Id.*

*Extracting Oil*, 56 Interior Dec. 206, 211 (1937) (under 1875 Act "any use of a railroad right of way, or any portion thereof, for *other than* railroad purposes is prohibited.  A right of way granted by Congress through the public domain may be used *only* and *exclusively* for railroad purposes").

Finally, the Interior memorandum cited *United States v. Denver & Rio Grande Railway Co.*, 150 U.S. 1 (1893), for the proposition that railroad grants are to be interpreted more liberally than is implied by the general rule calling for interpretation of government grants strictly against the grantee.  In that case, interpreting the 1875 Act, the Supreme Court explained:

> When an act, operating as a general law, and manifesting clearly the intention of congress to secure public advantages . . . offers to individuals or to corporations, as an inducement to undertake and accomplish great and expensive enterprises or works of a quasi public character in or through an immense and undeveloped public domain, such legislation stands upon a somewhat different footing from mer[e]ly a private grant, and should receive at the hands of the court a more liberal construction in favor of the purposes for which it was enacted.

*Id.* at 14.

*Denver & Rio Grande* does not support AT&T's "any purpose not inconsistent with" canon of construction.  In *Denver & Rio Grande*, the question was whether the railroad could take timber from one section of its right of way and use it to build the rail line at points remote from where it was taken.  The grant expressly authorized the railroad "to take from the public lands adjacent to the

line of said road material, earth, stone, and timber necessary for the construction of said railroad."  In articulating the above-quoted canon, the Court was merely rejecting an artificially narrow interpretation of the 1875 Act that would have required that timber taken adjacent to the line of the railroad be used to construct only adjacent sections of the track.  According to the Court, the case:

> presents the question as to where, or at what place, *and for what purposes*, the railway company may rightfully use timber or other material taken from the public lands adjacent to the line of its road. . . . The license to take timber is not, by the language of the act, limited to what is necessary for the construction of such portion of the road as is adjacent to the place from which the timber is taken, but extends to the construction of the entire "railroad."  The right is given to use the material "*necessary for the construction of said railroad.*"  This language treats the railroad as an entirety, in the construction of which it was the purpose of congress to aid by conferring upon any railway company entitled to the benefits of the act the right to take timber necessary for such construction from the public lands adjacent to the line of the road. . . . As to the purposes for which the material may be used, it must be borne in mind that the benefits intended to be conferred by the act are not confined or limited to the roadbed or roadway, as the foundation upon which the superstructure is to rest, but are extended to the "railroad" as a completed or perfected structure.
>
> In addition to the right of way and the right to take timber for the purposes of this completed or entire structure called the "railroad," there is granted by the act "also ground adjacent to such right of way for station buildings, depots, machine shops, side tracks, turnouts, and water tanks. . . ."  By this provision, these structures, which are necessary appurtenances to all railroads, may fairly be regarded as parts or portions of the railroad, whose construction it was the purpose of congress to aid.  [T]he term "railroad" fairly includes all structures which are *necessary and essential to its operation.*  As already stated, it was not the intention of congress to aid in the mere construction of the roadbed or roadway, but to aid in the construction of the railroad as such. . . .  It is no forced interpretation to hold that the right to take timber was intended to aid in the erection of structures without which the railroad would have been practically useless.

-51-

*Id.* at 9-13 (emphasis added).

The passage does not support AT&T's proposed interpretation that would permit "any purpose not inconsistent with" a railroad. Indeed, the Court in *Denver & Rio Grande* was precise in delineating and adhering to Congress's intent to grant such rights as would be "necessary for the construction of said railroad." The language certainly does not support the proposition that Congress intended to grant all rights not inconsistent with such a purpose. If Congress had so intended, the lengthy passage quoted above would have been pointless.

The clear implication of *Union Pacific* is that purposes that are not incidental to or do not facilitate the operation of the railroad are beyond the scope of the pre-1871 grants. 353 U.S. at 114 ("*That purpose is not fulfilled* when the right of way is used for *other purposes.* . . . [W]hatever may be the nature of Union Pacific's interest in the right of way, drilling for oil on or under it is *not a railroad purpose.*") (emphasis added). And *Great Northern* states explicitly that the 1875 Act grants to the railroads rights qualitatively and quantitatively lesser than those granted under the earlier acts. Accordingly, the court rejects AT&T's proposed interpretation of the 1875 Act. The installation and operation of fiber optic communications cables does not derive from or further a *railroad* purpose, even though it may well serve a broader public purpose. The court therefore cannot hold as a matter of law that installation of AT&T's cables within the rights of way

-52-

that cross the Peterson plaintiffs' properties was within the scope of the railroad's easements. AT&T is not entitled to summary judgment against the Peterson plaintiffs.

*Conclusion*

The land beneath the rights of way granted pursuant to the 1862 and 1864 acts was appropriated by the United States when the grants were made and the railroads constructed. The land was thus severed from the public domain. The federal agents who issued patents to plaintiffs' predecessors had no authority to convey title to the land beneath the right of way. Accordingly, plaintiffs have no rights in that land on which to base their claims. The land beneath the right of way granted pursuant to the 1875 Act was not appropriated by the United States when the grant was made and the railroad constructed; rights to this land passed to the Peterson plaintiffs' predecessors upon issuance of the patents. Because AT&T's use of the land beneath the right of way exceeds the scope of the grant, AT&T is not entitled to summary judgment as to the plaintiffs' claims related to the 1875 Act. Accordingly, AT&T's motion for summary judgment is granted with respect to the claims involving the 1862 and 1864 acts and denied with respect to the claims involving the 1875 Act.

So ordered.

Date: September 7, 2005

_David F. Hamilton_

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Nels John Ackerson
ACKERSON KAUFFMAN FEX PC
nackerson@ackersonlaw.com

Arlene G. Anderson
PRICE WAICUKAUSKI RILEY & DEBROTA
aanderson@price-law.com

James McGinnis Boyers
WOODEN & MCLAUGHLIN LLP
jboyers@woodmaclaw.com

Jeffrey Grant Cook
BALTIMORE CO. OFFICE OF LAW
jgcook@co.ba.md.us

Daniel John Crothers
NILLES ILVEDSON STROUP PLAMBECK & SELBO LTD
dcrothers@nilleslaw.com

Howard N. Feldman
DICKSTEIN SHAPIRO MORIN & OSHINSKY
feldmanh@dsmo.com

Roger Coleman Johnson
KOONZ MCKENNEY JOHNSON DEPAOLIS & LIGHTFOOT
rjohnson@koonz.com

Jordan Matthew Lewis
SIEGEL BRILL GREUPNER DUFFY & FOSTER
jordanlewis@sbgdf.com

Lois J. Lipton
ROBINSON CURLEY & CLAYTON PC
llipton@robinsoncurley.com

Susan Littell
DICKSTEIN SHAPIRO MORIN & OSHINSKY
littells@dsmo.com

Daniel James Millea
ZELLE HOFMANN VOELBEL MASON & GETTE LLP
dmillea@zelle.com

Frances J. Miller
DICKSTEIN SHAPIRO MORIN & OSHINSKY
millerf@dsmo.com

Mike J. Miller
SOLBERG STEWART MILLER & JOHNSON LTD
mmiller@solberglaw.com

Peter Webb Morgan
DICKSTEIN SHAPIRO MORIN & OSHINSKY
morganp@dsmo.com

Nicholas Christo Nizamoff
STUART & BRANIGIN
ncn@stuartlaw.com

Henry J. Price
PRICE WAICUKAUSKI RILEY & DEBROTA
hprice@price-law.com

B. Haven Walling Jr.
DICKSTEIN SHAPIRO MORIN & OSHINSKY
wallingb@dsmo.com

Nancy Winkelman
SCHNADER HARRISON SEGAL & LEWIS
nwinkelman@schnader.com

William P. Wooden
WOODEN & MCLAUGHLIN LLP
wwooden@woodmaclaw.com

LYNN DOREEN DUCSAY
.NULL.

LA BAHIA COURT LLC
.NULL.